1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF FLORIDA
2
3    IN RE:                      CASE NO.06-13274-BKC-JKO
4    NEW RIVER DRY DOCK, INC.,
5            Debtor.
     _____/
6

MOTION FOR SANCTIONS PURSUANT TO FRBP 9011 ATTORNEY
7     MISCONDUCT AGAINST KEVIN GLEASON, ESQUIRE FILED BY
       CREDITOR MARINA MILE SHIPYARD, INC. (550); SECOND
8    APPLICATION FOR ADMINISTRATIVE EXPENSES FOR ALLOWANCE
     AND PAYMENT OF POST-CONFIRMATION ADMINISTRATIVE CLAIM
9    FILED BY CREDITOR MARINA MILE SHIPYARD, INC. (556);
      MOTION TO APPROVE ASSIGNMENT OF NEW RIVER DRY DOCK
10     PLAN ADMINISTRATOR'S INTEREST IN RIGHTS AGAINST
        BROKER TO MARINA MILE SHIPYARD, INC. FILED BY
11        CREDITOR MARINA MILE SHIPYARD, INC. (559)
12
13                       January 4, 2011
14
15           The  above-entitled  cause  came  on  for
16   hearing  before  the  HONORABLE JOHN K. OLSON, one  of
17   the judges of the  UNITED STATES BANKRUPTCY COURT, in
18   and for the SOUTHERN DISTRICT OF FLORIDA, at 299 East
19   Broward  Boulevard,  Fort Lauderdale, Broward County,
20   Florida  on  January 4, 2011  commencing  at or about
21   2:00 p.m.,  and the  following proceedings  were had:
22
23
24
25           Reported By:  Bonnie Tannenbaum

Page 2

```
 1                   APPEARANCES:
 2             JENNINGS & VALANCY, P.A., by
               ROBERT L. JENNINGS, ESQUIRE
 3          On behalf of Marina Mile Shipyard
 4
                 AKERMAN SENTERFITT, by
 5              JAMES H. FIERBERG, ESQUIRE
            On behalf of the Plan Administrator,
 6                    Mary Wickman
 7
               KEVIN C. GLEASON, P.A., by
 8              KEVIN C. GLEASON, ESQUIRE
            On behalf of Christopher Denison and
 9               Kevin Gleason, Esquire
10
11                  ALSO PRESENT:
12          MARY WICKMAN, PLAN ADMINISTRATOR
13                  — — — — — —
14
15
16
17
18
19
20
21
22
23
24
25
```

1          THE COURT:  I think all of the motions are

2   yours, Mr. Jennings.

3          MR. JENNINGS:  Yes, Your Honor.  We'd like

4   to take them in the order they were filed.  I think

5   there's some logic to that.  Also, I was told Mary

6   Wickman would be here, and the first motion doesn't

7   directly affect her.

8          May it please the Court.  Our first motion

9   is a 9011 motion.  It is relating to the notice of

10  claim of exemption that was filed by Mr. Gleason on

11  behalf of Mr. Denison.  We moved to strike that

12  notice of claim on November 3rd, and the same day I

13  sent him by fax and mail a motion for sanctions,

14  which was not filed until November the 29th, 26 days

15  later.

16          As set forth in our motion to strike, we

17  believe that the notice of claim of exemption

18  violated or was groundless in three respects.  First,

19  factually, the claim of exemption was asserted with

20  respect to money that was in the hands of Marine

21  Realty, Inc., so that's a factual lack of evidentiary

22  support.

23          Number two, legally, as set forth in our

24  motion to strike, monies due or potentially due the

25  owner of a closely held corporation on a

Page 4

1   discretionary basis are not earnings exempt under

2   Florida Statutes 222.11.

3          Additionally, from a procedural standpoint,

4   Mr. Gleason was attempting to invoke a statute that

5   on its terms applies only to attachments and

6   garnishments, which this was neither.

7          Finally, the exemption issue had been

8   previously raised at a hearing on September 30th and

9   rejected, as set forth in an order of October 8.

10          So we believe that the -- and finally, as

11   set forth in our motion, we believe the notice was

12   signed and filed for an improper purpose of

13   interfering with compliance with this Court's order

14   relative to the funds that were recovered from

15   Mr. Denison.

16          On that basis, we believe that 9011

17   sanctions are appropriate, and we have filed a fee

18   report reflecting our time and expenses incurred,

19   which is limited to, specifically, the time involved

20   in dealing with this claim of exemptions.  And what

21   I've done, Your Honor, is we use Quickbooks -- I'm

22   sorry, time slips, and where there were multiple

23   entries relating to various things, I apportioned

24   those, and carved out anything that didn't directly

25   relate to the claim of exemption, the total side is

1   3,649.95.  We believe this is appropriate, because

2   Marina Mile was put to this expense unnecessarily.

3   It's our position the Court had already ruled these

4   funds weren't exempt, and Mr. Gleason well knew that.

5            THE COURT:  Thank you, Mr. Jennings.

6            Mr. Gleason.

7            MR. GLEASON:  Thank you, Your Honor, and

8   good afternoon.

9            THE COURT:  Good afternoon.

10            MR. GLEASON:  For the first matter on, I'm

11   representing -- I'm here for myself, so I suppose I

12   do have a fool for a client.  However, I do need to

13   point out a few things that are apparent to me.

14            Number one is on the substantive basis for

15   Rule 11 sanctions.  The fact that my client did not

16   prevail is not grounds for imposition of sanctions.

17   The Court must find that there was either an improper

18   purpose, or that there was no legal or factual basis

19   for the assertion.  And 222.11 on its face gives

20   clear grounds for the assertion, 222.11(a) defines

21   earnings as including commissions.  Mr. Jennings

22   points to -- I believe he was referring to the

23   Zamorra (phonetic) case, which is a case where an

24   attorney wholly owned his own P.A., and Judge Mark

25   found that his withdrawals from that P.A. were not

1   earnings within the meaning of the statute.

2           Here we have a corporation that is not

3   owned by Mr. Denison, it is 100 percent owned by his

4   wife.  And so that's a distinguishing factor.

5           Secondly, there was no dispute that

6   Mr. Denison is the head of the family.  The

7   disposable earnings are not -- cannot be attached or

8   garnished under 222.11(b).  And the fact that those

9   earnings were in the bank account of Marine Realty is

10  irrelevant in light of 222.11(3), which provides that

11  earnings that are exempt under Subsection (2), and

12  are credited or deposited in any financial

13  institution are exempt from attachment or

14  garnishment.  And, quote, "it does not require that

15  the money be in the judgment debtor's account," it

16  says, any financial institution.

17          So, on a substantive basis, it is not clear

18  that there is no legal basis.  In fact, it is quite

19  clear that there is a reasonable legal basis for

20  having sought the protection of the funds that

21  Mr. Denison claimed were commissions to the head of a

22  household that were held in a bank account.

23          The second observation that I make is that

24  the motion was filed one day too early.  It is

25  required that there be a 21 safe harbor.  That is

1    strictly interpreted.  So if a motion is filed before

2    the 22nd day, then it is -- the Court must deny it.

3    And the three-day rule applies.  There is no

4    citation for authority for providing service by means

5    other than mail or hand delivery under Rule 911, and

6    that's because there isn't any.  If it's mailed, the

7    three-day rule in 9006 applies, Bankruptcy Rule 9006,

8    and that means that you calculate it as follows:

9    mailed November 3rd, November 3rd plus three days is

10   November 6th, which is a Saturday, 21 days brings you

11   to November 27th, which is a Saturday.  The 21st day

12   under the way we count things here would have been

13   Monday the 29th of November, which is the day this

14   was filed, and it should not have been filed before

15   the 30th.

16          And my last observation is that I did not

17   sign the claim of exemption, I signed only the

18   certificate of service.  There is no question that

19   the certificate of service is accurate.  Mr. Denison

20   signed the claim of exemption.  And so the motion

21   seeks sanctions against me for a document that I did

22   not sign.

23          For those three reasons, I'd ask the Court

24   to deny the motion.

25          THE COURT:  Thank you.

1    MR. JENNINGS:  Okay.  First of all,

2  Mr. Gleason suggested that if funds are in a

3  financial institution, the exemption can still apply,

4  but, of course, Marine Realty, Inc. is not a

5  financial institution.

6    Number two, with respect to the authorities

7  we cited for the proposition that monies that are

8  drawn out of a company at discretion, we cited a

9  Fourth DCA case and some bankruptcy cases, but they

10  all go to the point that earnings, as defined under

11  the statute, have to be a sum certain that comes out

12  on a regular basis, not monies drawn from a company

13  at one's discretion.  And since they weren't in

14  Marine Realty anyway, we contend that the factual

15  basis for the claim of exemption that was filed with

16  the Court under Mr. Gleason's signature -- I see

17  that, you know, Christopher Denison's name is typed

18  at the bottom of this, but it was obviously prepared,

19  and submitted, and signed under Mr. Gleason's

20  signature.  And if Mr. Denison had attempted to file

21  this without Mr. Gleason's signature, it would have

22  had no effect, if it even would have been accepted by

23  CM/ECF.

24    Mr. Gleason was well aware that this motion

25  existed.  We had to set it for hearing.  We asked him

1   to withdraw it, and he didn't.

2           Finally, with respect to calculation of the

3   time, Mr. Denison -- I'm sorry, Mr. Gleason seems to

4   have added and twisted weekends, and mailing, and

5   this and that.  I mean, first of all, with respect to

6   faxing, it's a customary means of delivery, and I

7   would argue constitutes the effect -- the functional

8   equivalent of hand delivery.

9           Secondly, 29 days is not 21 days.  And I

10  don't think you start by adding the mailing.  I think

11  what the rules say is you calculate the time, and

12  then you add three days at the end.  And if you do

13  that, we believe we complied with the rule.

14          So, that's all I have to say.  Thank you.

15          THE COURT:  Thank you.

16          Anything else?

17          MR. GLEASON:  I believe I addressed all

18  those points, Your Honor.

19          THE COURT:  Thank you.  What provision of

20  Rule 9006 are you relying on, Mr. Gleason?

21          MR. GLEASON:  9006(f) and, of course,

22  9006(a), which provides that when the day lands on a

23  Saturday, Sunday or holiday, that you get until the

24  following date.  And if you calculate in accordance

25  with the way Mr. Jennings suggests, the 21st day

1   winds up being on the holiday that the Court was

2   closed, Thanksgiving.

3          So, either way, you either add the three

4   days up front, or add the three days in the back, you

5   get to the same place.

6          THE COURT:  Okay.  I need to count my

7   fingers and toes, I'll take this under advisement.

8          Next, Mr. Jennings.

9          MR. JENNINGS:  Yes, Your Honor.  Let me

10  note for the record that Mary Wickman has joined us.

11         THE COURT:  Good afternoon, Mrs. Wickman.

12         MS. WICKMAN:  Good afternoon.

13         MR. JENNINGS:  Actually -- well, we have

14  two other motions as to which we do not believe

15  Mr. Gleason or his client have any standing to be

16  heard on, but one of them is a second application for

17  approval of administrative expenses, and the other is

18  a motion to approve assignment of the plan

19  administrator's interest.  With the Court's

20  permission, I'd like to address them together.

21         THE COURT:  Sure.

22         MR. JENNINGS:  The motion to approve

23  assignment of the plan administrator's interest is a

24  product of the long and painful litigation attempting

25  to enforce the agreed order to return money that

1  Mr. Denison agreed that he owed, and also to pursue

2  the undisclosed adverse interest which has been the

3  subject of our motion for disgorgement.

4        What Mary Wickman negotiated with Marina

5  Mile Shipyard was an assignment of her interest in

6  this litigation, including whatever has been awarded,

7  and may subsequently be awarded.  The benefit to the

8  estate, apart from $7,500 cold cash, which is

9  certainly not as much as we would have liked, but is

10  what there is at this point, and also puts her labors

11  in this matter, and Mr. Fierberg's, to an end.

12        There's a desire to wrap up this estate as

13  soon as possible, and with the pending appeal by

14  Mr. Denison, as to which no stay has been sought or

15  obtained, this matter -- there's a good chance it

16  will go on for a long time, and there isn't

17  necessarily any pot at the end of the rainbow.

18        So what is being suggested is that, because

19  we have already established under our first

20  application for fees, fees and costs in excess of

21  $39,000, I did bring with me to court today an update

22  which has a similar amount that's been incurred since

23  then.  We didn't file it with the Court, because the

24  client did not necessarily wish to share this

25  information with opposing counsel.

1          As far as people who do have standing to

2    speak on the subject, Mary Wickman is here to say

3    that she supports the assignment, and also our fee

4    app, which is capping our fees and costs at

5    18,481.41, which is a small fraction of what's owed

6    for the work on this case to date, and would commit

7    Marina Mile to seeing this through to a conclusion

8    one way or the other.

9          In addition to that, Your Honor, I was sent

10   e-mails today from Mr. Beeber (phonetic) and

11   Mr. Gordon (phonetic), who are the next two largest

12   unsecured creditors in the case besides Marina Mile

13   Shipyard, and they advised that they support the

14   motion.

15         So, we are respectfully asking the Court to

16   approve the assignment, and to award fees and cost of

17   18,481.41 on a final basis, because this would

18   effectively conclude the plan administrator's

19   involvement in this litigation, except potentially as

20   a witness.  And we address that in the assignment by

21   saying that if we call upon her to testify or produce

22   records, that she will be entitled to reasonable

23   compensation for those efforts.

24         So we think this is a pragmatic solution,

25   making the best of a bad business, and ask the Court

1    to approve same.

2            THE COURT:  Thank you.

3            Mr. Fierberg.

4            MR. FIERBERG:  Good afternoon, again, Your

5    Honor.  It's been a long time since I've stood before

6    you in this case, and I've done that on purpose.

7    Although I started this debacle, and I don't mean

8    that in a negative way, by a simple show cause order,

9    it took on a life of its own, and I was not sanguine

10   about the outcome.  So I decided to sit back and not

11   have this estate incur any additional unnecessary

12   fees for my role.  For the record, I represent Mary

13   Wickman, the post-confirmation plan administrator,

14   and was also counsel for the debtor-in-possession.

15           I want to confirm what Mr. Jennings had

16   said, with one clarification, he may have said it and

17   I may have missed it, that the fees that he is

18   receiving as an administrative expense come out of

19   the recoveries that have been made, and not out of

20   the existing corpus of the $7,500 that is being paid

21   to the estate.

22           MR. JENNINGS:  That's correct.

23           MR. FIERBERG:  Okay.  On that basis, Judge,

24   let me just bring you up to date on where we are.  We

25   are very happy to be able to close this case.  I

1    think it's in the best interest of everybody.  There

2    are a few open items that will be coming before you

3    along with our closing documents, and that is, there

4    are two years of taxes post-confirmation that need to

5    be done by Mr. Nicols (phonetic), who has been

6    previously retained by the Court.  We estimate that

7    that will be no more than $5,000.  Ms. Wickman

8    believes she is entitled to an additional

9    administrative expense for all that's gone on since

10   the last payment to her of probably about $5,000.

11   And I can tell the Court that the last time I looked

12   on my whip on this case, I haven't filed an

13   application in quite some time, I may have $6,000.

14   That's about 16,000, Judge.  We think we have just

15   north of 50 in the estate.  And the rest would then

16   be, aside from the U.S. Trustee fees, which would

17   also be paid, the rest would be immediately

18   distributed to creditors to bring this case to a

19   close.

20              THE COURT:  Thank you.

21              MR. FIERBERG:  Thank you, Judge.

22              THE COURT:  Does anyone else wish to be

23   heard?

24              MR. GLEASON:  Your Honor, my presence being

25   noted that I concur that I don't think that

1   Mr. Denison has standing.

2           THE COURT:  Okay.  Then I will allow the

3   second application for administrative expenses in

4   full in the amount of 18,481.41, and will approve --

5   grant the motion to approve the assignment by the

6   plan administrator to Marina Mile Shipyard, Inc.

7           MR. GLEASON:  Your Honor?

8           THE COURT:  Yes, sir.

9           MR. GLEASON:  I thought we were going in

10  order of the matters, and I perceived that --

11          THE COURT:  Mr. Jennings addressed -- said

12  that he was going to address both.

13          MR. GLEASON:  I apologize, Your Honor.  As

14  to the assignment, I only have one comment, I think

15  we do have some standing there.  There is no

16  authority cited in the motion for the ability to

17  assign any causes of action that were conveyed to the

18  plan administrator, and that's because there isn't

19  any.

20          THE COURT:  And is there authority saying

21  you can't do so?

22          MR. GLEASON:  The authority, Your Honor, is

23  that the documents that this Court confirmed create

24  the new arrangement.  If it's not in there, it

25  doesn't exist.  And if someone wants to cite to the

1   contrary, but I just looked through the documents

2   looking for the ability of the plan administrator to

3   assign, and I find none.  And obviously there are

4   such assignment provisions in other liquidating

5   trusts.  There's provisions for substituting the plan

6   administrator, but there's no provisions for

7   assigning a cause of action that the plan

8   administrator deems to be within her power to pursue.

9              THE COURT:  Thank you.

10             MR. FIERBERG:  It's been a long time since

11  I looked at that document that I drafted, but my --

12  and I'll take the time to look at one if somebody has

13  it here, but, you know, our intention of that is that

14  it would be just like a debtor-in-possession, a

15  business judgment of the plan administrator would be

16  the paramount concern, provided there were certain

17  debt limits that were -- there were certain things

18  she couldn't do if the claims were over 50,000, as I

19  recall.  But this certainly falls within her business

20  judgment as the plan administrator.

21             THE COURT:  Well, let me ask you and

22  Mr. Jennings a question, and that is, let's assume

23  that it's assigned, what does that do to my

24  jurisdiction over the dispute?

25             MR. FIERBERG:  I will keep the case open or

1   closed as long as the Court wants, but with the --

2           THE COURT:  I'm not wildly enthusiastic

3   about keeping a case open an hour longer than it

4   needs to be, but --

5           MR. FIERBERG:  Nor am I.  Now, I have to

6   let Mr. Jennings address that, but our goal is to

7   assign this to a third party paying their

8   consideration under the business judgment of Ms. --

9   this is not an avoidance action.  It's not something

10  that's inherently a bankruptcy issue.  It's a cause

11  of action, and --

12          THE COURT:  Well, it's a cause of action

13  that arises out of a fee issue that was part of the

14  administration of the case.  This is a clawback, if

15  you will, of a fee.

16          MR. FIERBERG:  I agree with that, Judge.  I

17  think that the solution off of the top of my head,

18  because this is the first time I'm thinking about

19  this, is that the creditors ought to be paid, and

20  this litigation is going to go on before you, I

21  presume.  I don't know the status of the appeal, or

22  what's going to happen, but the creditors ought to

23  get paid, and we ought to be able to close out that

24  aspect of the case, even if we don't do a final

25  decree until the end of this.

1          But I'll defer to everybody.  I just want

2   to get the $7,500 in, and pay these people their

3   money they've been waiting for years for.

4          THE COURT:  Thank you.

5          MR. FIERBERG:  Thank you, Judge.

6          THE COURT:  Mr. Jennings --

7          MR. JENNINGS:  Yes, Your Honor.

8          THE COURT:  -- do you have any concerns

9   about standing and jurisdiction?

10         MR. JENNINGS:  If the Court were to

11  entirely dismiss the case, I would be concerned.  My

12  hope would be that we could wrap up the trial level

13  litigation as to the disgorgement issue relatively

14  quickly.

15         As far as the power of the trustee, I think

16  the -- I'm sorry, the plan administrator, I believe

17  the plan administrator does have authority to take

18  assets, which this is, and sell them.  And this is

19  not a complete stranger, it is a creditor of the

20  estate.  So I think the only concern would be that if

21  the Court -- if a claim is assigned, then the action

22  can continue in the name of the assignee.  And it

23  would be our intention, as soon as we have an

24  outcome, the case will either be in favor of Denison

25  or against him.  If it's against him, we can enforce

```
 1    our rights in State Court once we have a judgment,

 2    but I think it would be appropriate if there is some

 3    way --

 4              THE COURT:  Well, I want you to think

 5    through for me, and walk me through your analysis --

 6              MR. JENNINGS:  Uh-huh.

 7              THE COURT:  -- of what -- under what

 8    provision of Section -- of 28 USC Section 157 would

 9    this claim arise, or would support jurisdiction here

10    over this claim.  Clearly, the claim arises out of an

11    administrative expense overpayment, if you will.  And

12    is it your notion that I have jurisdiction under -- I

13    don't know if you have a copy of 157 with you, but it

14    might be a useful thing to have.  Is this a matter

15    concerning the administration of the estate under

16    157(b)(2)(a)?

17              MR. JENNINGS:  That would be our

18    contention, because notwithstanding the assignment of

19    the claim, the claim arose based upon the

20    relationship of the parties to the bankruptcy case.

21              THE COURT:  Okay.  Anything else you want

22    to tell me about?

23              MR. JENNINGS:  Mr. Fierberg was leafing

24    through the plan.  I don't know if he has anything to

25    add.
```

1              THE COURT:  That would be useful.

2              MR. JENNINGS:  But if I could just wrap up

3    and say that it's our contention that if the claim

4    can be assigned, then there should be no impediment

5    to it being prosecuted by Marina Mile Shipyard and

6    the Court concluding the matter.  And if the Court

7    has any concern that we're going to be in front of

8    you on this case for the rest of time, it would be

9    our intention as soon as we can to enforce whatever

10   rights we have through State Court procedures, which

11   I think we would be able to do.

12             THE COURT:  Well, you know, I neither look

13   for nor run away from whatever walks in the door.

14             MR. JENNINGS:  I understand, Your Honor.

15   Thank you.

16             THE COURT:  Thank you.

17             MR. FIERBERG:  Judge, just briefly here, I

18   haven't seen this in a long time, and maybe that's my

19   fault, but you have retained exclusive jurisdiction

20   under Article 10.1 of the confirmed plan to, among

21   other things, allow, disallow, determine, liquidate,

22   classify, estimate or establish the priority or the

23   status of any claim, including the resolution of any

24   request for payment of any administrative claim.  So

25   I think it can at least be framed around the fact

1   that there was an overpayment of an administrative

2   claim, and you retain jurisdiction for that.  And if

3   you give me five minutes to read through this, I'm

4   quite sure I can come up with some other --

5           THE COURT:  Okay.  Well, spend a couple of

6   minutes.  I'm obviously catching you unawares.

7           MR. JENNINGS:  Your Honor, if I could add

8   one more thing.  It occurs to me that if the plan

9   administrator had a meritorious claim and wanted to

10  pursue it and didn't have the money to do so, she

11  could borrow money and pledge the proceeds of the

12  litigation as collateral.  And if the trustee can do

13  that, then the objection is a form over substance

14  objection, because that's effectively what's being

15  done here is that --

16          THE COURT:  Well, except she has no upside.

17          MR. JENNINGS:  That is correct, except the

18  ability to close the estate, which is --

19          THE COURT:  Which is --

20          MR. JENNINGS:  -- consummation --

21          THE COURT:  -- inherently of benefit to

22  stop the running of admin expenses for the U.S.

23  Trustee, if nothing else.

24          MR. JENNINGS:  Right.

25          THE COURT:  Okay.

1    MR. FIERBERG:  Judge, I'm finding at least

2  two more that may fall within that ambit, and one of

3  them is under 10.1(a) -- let's see, 10.1 -- I'm

4  sorry, I lost my place here.  I apologize, Judge,

5  just give me, please, one minute.

6    THE COURT:  Sure.

7    MR. FIERBERG:  This is (e), decide or

8  resolve any motions, adversary proceedings, contested

9  or litigated matters, or any other matters, and grant

10  or deny any applications involving the debtor, its

11  affiliates, directors, employees, agents, or

12  professionals, or the plan administrator that may be

13  pending on or filed subsequent to the effective date,

14  which this was.

15    Resolve any cases, controversies, disputes,

16  suits that may -- this is (g), that may arise in

17  connection with consummation, interpretation or

18  enforcement of the plan, or any person's or entity's

19  obligations incurred in connection with the plan.

20    This is (n), determine post-confirmation

21  estate's exclusive ownership of claims and causes of

22  actions.  Interpret any orders previously entered in

23  the Chapter 11 case.  Well, certainly your order

24  employing Mr. Denison was one of those.

25    And, of course, there's a throw away, which

1    is here and act on any matter not inconsistent with

2    the Bankruptcy Code.  I have not gone through the

3    non-exclusive jurisdiction, Judge, but I think that,

4    at least, those few bones allows you to keep your

5    teeth in this until the resolution.

6              THE COURT:  Okay.  Thank you.

7              MR. FIERBERG:  Thank you, Judge.

8              THE COURT:  Mr. Gleason.

9              MR. GLEASON:  Your Honor, I believe what

10   was just addressed was the Court's continuing

11   post-assignment jurisdiction --

12             THE COURT:  Yes.

13             MR. GLEASON:  -- the Court raised.  I don't

14   have an opinion on that.  I was looking at the plan

15   for the rights of the plan administrator to assign,

16   which would be in Articles IV or V of the plan.  And

17   I'm looking at Page 24 -- excuse me, the ECF number

18   is Page 26 of 39.  And this is Section 5.1(r), which

19   is at the end of a long list of specific rights that

20   the plan administrator has.  Nowhere is there the

21   right granted to assign an asset of the estate.  And

22   the very last line of 5.1 is (r), and it says, to

23   have entire control and management of the

24   post-confirmation estate.

25             So that's just one example of specific

1   provisions where the plan administrator may do

2   something, and nowhere does it say the plan

3   administrator can assign the rights to do something

4   to someone else.

5            MR. FIERBERG:  Judge?

6            THE COURT:  Yes.

7            MR. FIERBERG:  In that same section, I

8   mean, we can parse this thing to death, but in (e),

9   it allows the plan administrator the right to do and

10  perform any acts or things necessary or appropriate

11  for the management, conservation and protection of

12  the assets, including acts or things necessary or

13  appropriate to maintain assets held by the plan

14  administrator.  I would submit, Judge, that that in

15  itself, is a basis.  There's 50 something thousand

16  dollors in the estate we've been cherishingly,

17  assiduously guarding for the general unsecured

18  creditors of this estate.  To allow this to go on

19  much further on Ms. Wickman's nickle is going to bite

20  into the money that's available to pay these

21  creditors.  And to be able to get $7,500 to bring

22  this to an end and allow her to do that, to me

23  makes -- is the height of good business judgment, and

24  I think it falls within the context of what was

25  intended in the drafting of this document.

1          THE COURT:  Judge, often times, stopping in

2    the middle of a sentence will not give the sentence

3    its contextual meaning, and that's exactly what

4    happened here.  The sentence reads, on Page 22 of 39

5    at Docket Entry 166, to do and perform any acts or

6    things necessary or appropriate for the management,

7    conservation and protection of the, capital A,

8    Assets, including acts or things necessary or

9    appropriate to maintain, lower case a, assets held by

10   the plan administrator pending sale or other

11   disposition thereof, or distribution thereof to the

12   creditors, and in connection therewith to employ such

13   agents, including professionals, as provided for in

14   the plan, and to confer upon them such authority as

15   the plan administrator may deem expedient, and to pay

16   fees and expenses therefore.

17          Now, capital A, Assets, is a defined term,

18   and it does not include the subject of this attempted

19   assignment.

20          MR. FIERBERG:  Back to the definition of

21   assets.  I'm not sure the term assets is defined.

22   Maybe Mr. Gleason can help me, I don't see it as a

23   defined term.

24          THE COURT:  Where is it defined,

25   Mr. Gleason?

1          MR. GLEASON:  The first place it's defined,

2     Judge, is in the term, confirmation date assets,

3     which is on Page 6 of 39.

4          THE COURT:  Thank you.

5          MR. GLEASON:  And I will find the others.

6          MR. FIERBERG:  I think confirmation date

7     assets is different than assets, Judge.  Confirmation

8     date assets speaks to a specific genre of assets

9     including avoidance actions under Chapter 5, and that

10    sort of thing.  The use of the world assets with a

11    capital A may have been imprudent drafting, but they

12    mean what they mean.  They mean property that enures

13    to the benefit of the owner who is Mary Wickman.  I

14    think it's improper to try and tie that word assets

15    to another defined term.

16          So, again, I think, Judge, for $7,500, we

17    can parse this to death, but this pragmatism that has

18    to come to this Court, it usually and almost always

19    comes into this court.  We have a case that is a 1906

20    entry, the bulk of the work was done in this years

21    ago, it's time to let these creditors have their

22    money, Judge.

23          THE COURT:  I hope this was a 2006 case,

24    and not a 1906 case.

25          MR. FIERBERG:  Did I say 1906, Judge?

Page 27

1        THE COURT:  You did, but --

2        MR. FIERBERG:  I'm having a lot of trouble

3   since the millennium.  I'm already starting to work

4   year 3k into my loan documents.

5        THE COURT:  Perfect.  Perfect.

6        MR. FIERBERG:  But whether it's 2006 or

7   1906, Judge, it's a long time --

8        THE COURT:  It's a long time.

9        MR. FIERBERG:  -- in a not huge case.  We

10  got a good result for the creditors, and it's time to

11  let them go on their way.

12       THE COURT:  Okay.  I think I've heard

13  enough and asked enough questions to cause people's

14  heads to explode.  I find that the proposed sale of

15  the claim against Mr. Denison and Marine Realty is

16  within the broad grant of authority vested in the

17  plan administrator, provided, of course, that as a

18  transaction considerably outside the order course of

19  business, it is appropriately brought before me for

20  approval.

21       I find that the purchase price being paid

22  by Marina Mile Shipyard is reasonable in the

23  circumstances, and I further find that I will have

24  continuing jurisdiction over the issues involving the

25  claim that is being transferred pursuant to the

Page 28

1   reservation of jurisdiction in the plan and the

2   confirmation order.

3          Accordingly, Mr. Jennings, would you give

4   me an order granting the motion to approve assignment

5   for the reasons stated on the record?

6          MR. JENNINGS:  May it please the Court.  I

7   know the current practice is to upload orders.  I

8   have taken the liberty of preparing a proposed order

9   on the administrative claim, and the order approving

10  assignment, which I would ask the Court, if they're

11  acceptable to the Court in form, to sign today, if

12  that is possible.

13         THE COURT:  Okay.

14         MR. JENNINGS:  If I may approach.  With

15  respect to the administrative claim, I wasn't quite

16  sure how that was going to break, so I included some

17  alternatives which I've scratched out, and I would

18  ask the Court to initial.

19         THE COURT:  Okay.  Thank you.

20         Mr. Jennings, I have signed both orders,

21  and we'll get them filed downstairs, unless you have

22  some reason you need it done immediately.

23         MR. JENNINGS:  If you have a conformed

24  copy, is it possible to give me a conformed copy to

25  give to the plan administrator?

Page 29

1              THE COURT:  Sure.

2              MR. FIERBERG:  Judge, when it comes

3    through, it's fine.

4              THE COURT:  Okay.

5              MR. FIERBERG:  This has been around since

6    1906, anyway.

7              THE COURT:  Exactly.  And it should get up

8    this afternoon --

9              MR. FIERBERG:  Thank you very much.

10             THE COURT:  -- assuming that it's not nuts

11   downstairs.

12             Okay.  Thanks very much.  We're adjourned.

13             MR. FIERBERG:  Thank you, Judge.

14

15

16

17

18

19

20

21

22

23

24

25

Page 30

1                          CERTIFICATION

2

3    State of Florida:

4    County of Dade:

5

6             I,  BONNIE  TANNENBAUM,  Shorthand Reporter

7    and Notary  Public  in  and  for the State of Florida

8    at Large,  do  hereby  certify  that  the  foregoing

9    proceedings  were  taken  before  me at  the date and

10   place  as  stated  in  the caption  hereto on Page 1;

11   that the  foregoing computer-aided transcription is a

12   true record of  my  stenographic  notes taken at said

13   proceedings.

14             WITNESS  my  hand this 19th  day  of  April,

15   2011.

16

17            _____

                      BONNIE TANNENBAUM

18            Court Reporter and Notary Public

          in and for the State of Florida at Large

19             Commission Number:  DD 968452

                  Expires:  June 22, 2014

20

21

22

23

24

25